UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| GLOBAL PARKING SYSTEM OF INDIANA, INC., | ) ) ) | |
| Plaintiff/Counter-Defendant, | ) ) | 1:13-cv-00284-RLY-DML |
| vs. | ) ) | |
| PARKING SOLUTIONS, INC., | ) ) | |
| Defendant/Counterclaim-Plaintiff. | ) | |

**ENTRY ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

This diversity case arises out of a Letter Agreement and a Joint Venture

Agreement ("JVA") between Global Parking System of Indiana, Inc. and Parking

Solutions, Inc. ("PSI"), to provide "parking and parking related services" to, *inter alia*,

the Indianapolis Airport Authority ("IAA").  Global accuses PSI of breaching both the

Letter Agreement and the JVA; PSI accuses Global of breaching the JVA.  Both parties

now move for summary judgment.  For the reasons set forth below, the court **DENIES**

Global's motion for summary judgment, and **DENIES** PSI's motion for summary

judgment.

**I.      Background**

PSI is in the business of providing valet parking, shuttle, and garage/lot

management services to airports, hospitals, and the like.  (Filing No. 73-3, Deposition of

Aaron Shocket ("Shocket Dep.[1]") at 35-36, 258).  Global is in the business of providing

shuttle services and, from 2002-2006, provided shuttle services at the Indianapolis

International Airport.  (Filing No. 64-1, Affidavit of Hal Darring ("Darring Aff.") ¶¶ 3-

4).

### A.    IAA Opportunity

In late 2006, the IAA issued a Request for Proposal ("RFP") seeking bids from

parking companies to provide valet parking services at the IAA.  (Darring Aff. ¶ 9).

Pursuant to the IAA RFP, any parking business that placed a bid on the valet services

contract had to address the IAA's MBE (minority business enterprise) participation goals.

(*Id*.).  Global, a state-certified MBE, was interested in expanding its business with the

IAA, and was encouraged by representatives of the IAA to submit a bid.  (Filing No. 73-

2, Deposition of Hal Darring ("Darring Dep.") at 32).  At the same time, PSI was

interested in expanding its airport parking business, and the Indianapolis International

Airport was part of its growth strategy.  (Filing No. 73-3, Shocket Dep. at 68-69).

Recognizing that a business relationship was mutually beneficial, Global's CEO, Hal

Darring, and PSI's CEO, Aaron Shocket, decided to meet and discuss a possible

partnership.  (*Id*. at 70-71; *see also id.* at 72 ("[Darring] informed me that the State of

Indiana was helping MBE businesses grow.  I thought, with our technical expertise and

our infrastructure, and with his status, we could grow.").

---

[1] The deposition designations for Aaron Shocket's deposition appear in more than one docket
number.  For ease of reference, therefore, the court will use the filing number before each
citation to his deposition.

On September 7, 2006, PSI (Shocket) proposed to Global (Darring) that the two enter into joint ventures in Indiana to provide parking services to the IAA, Indiana casinos, hospitals/hotels, and other entities to be agreed upon.  (Filing No. 64-5, Letter from Shocket to Darring).  PSI's proposal explained that Darring would have no capital contribution, nor would he share in any losses; rather, Darring's role would be to, among other things, "introduce [PSI] to prospective clients," "act as liaison to the client once contract[s] [were] secured," and "establish and maintain [] ongoing relationship[s] with clients."  (*Id*.).  Following the receipt of PSI's proposal, Global and PSI engaged in further contract negotiations initiated by PSI.  (Filing No. 64-6, Email chain between PSI's counsel and Global's counsel).

### B.     The Letter Agreement

On December 22, 2006, PSI and Global entered into a Letter Agreement.  (Filing No. 64-7, Letter Agreement).  The Letter Agreement was in effect for three years, to and including December 21, 2009, after which it expired pursuant to its terms.  (*Id*. at 2).  The terms of the Letter Agreement include: (1) "PSI and Global will enter into various Joint Venture Agreements the purpose of which are to govern the rights and responsibilities as between PSI and Global with respect to specific Parking Contracts"; (2) the term "parking and parking related services" shall have the meaning set forth in any applicable Joint Venture Agreement and related Parking Contract(s) entered into under the terms hereof"; (3) "if either party hereto solicits, or is solicited, to provide parking or parking related services . . . to any Indiana State, city or municipally owned, managed or operated business or facility, including but not limited to Airport and/or Casino or Casino related

businesses within the State of Indiana (hereinafter "State/Casino[2] Contract"), the other party shall have a Right of First Refusal to participate in those contracts under a Joint Venture Agreement"; and (4) the Letter Agreement "shall incorporate by reference and be made a part of any and all Joint Venture Agreements." (*Id*. at 1-2).

### C.     The Joint Venture Agreement[3]

At or around this time, Global and PSI obtained the valet services contract with the IAA and, pursuant to the Letter Agreement, entered into a JVA for the IAA valet parking business (the "IAA JVA"), with an effective date of December 1, 2006. (Filing No. 64-8, Joint Venture Agreement; *see also id.* at 1 ("WHEREAS, the parties desire to become associated with each other as joint venturers for the purpose of soliciting, obtaining, and fulfilling contracts for the provision of parking and parking related services to the Indianapolis Airport Authority [] . . . .")). The IAA JVA defined the term "parking and parking related services" to mean "valet parking services and all other services, excluding automobile detailing, related to valet parking." (*Id*. at 1). The IAA JVA also contained a non-competition and non-solicitation clause that provided that, for a period of two years after the IAA JVA terminated, neither party shall "[s]olicit, attempt to solicit, or engage in the provision of any parking or parking related services" to the

---

[2] There are no state-owned or operated casinos in Indiana. The parties agree that the Letter Agreement's terms applied to state or municipally owned facilities including airports, and that it applied to casinos that were receiving tax credits in exchange for MBE participation. (Filing No. 64-4, Shocket Dep. at 114-16).

[3] The IAA JVA contains an arbitration provision. (IAA JVA ¶ 18 at 7). The court presumes, by voluntarily litigating this action in this court, that the parties hereby waive that provision.

IAA, or solicit the other party's employees who provided valet parking services at the IAA. (*Id.* ¶¶ 20-21 at 7).

### D. Grand Victoria Casino & Resort

On January 4, 2007, Global and PSI jointly submitted a proposal to the Grand Victoria Casino & Resort ("Grand Victoria") to provide valet and shuttle services for the Grand Victoria Casino. (Filing No. 64-10, Letter from Darring to Grand Victoria Hotel Director). In the proposal letter, PSI and Global described their partnership as an agreement "featuring joint operation of all day-to-day functions including management . . . of valet and parking and shuttle services . . . ." (*Id.*). The record reflects that they were not awarded the contract.

In the months following that proposal, PSI marketed its relationship with Global to other Indiana casinos, with the ultimate plan of closing on at least one casino during 2007. (Filing No. 64-12, 2-22-07 Brown email chain). By February 22, 2007, Ric Brown, PSI's Business Development Manager, believed that PSI and Global had the best chance of closing on three Indiana casinos, Grand Victoria, Belterra, and French Lick Springs, "because of the location and the fact that [PSI had] already made personal contact and [Darring] knows them as well." (*Id.*). Brown and Darring were also working together to pursue the Argosy, Caesars, and Aztar casinos for parking contract work. (*Id.*).

### E. Indiana Live! Casino

In April 2008, PSI submitted a quote to provide shuttle and valet services for Indiana Live! Casino. (Filing No. 64-13, Parking Solutions Proposal; Filing No. 64-4,

Shocket Dep. at 204). In so doing, PSI provided Indiana Live! with materials concerning the types of parking services it could provide. (Filing No. 64-4, Shocket Dep. at 202-03). These materials included PSI's proposal to provide "[a] full service turn-key valet service and shuttle operation" at Indiana Live! (Filing No. 64-13, 4-14-08 Proposal to Indiana Live!). PSI did not include Global in these initial discussions. (*Id.* at 201-02). PSI ultimately obtained a contract with Indiana Live! on June 6, 2008, to provide shuttle services. (Filing No. 69-9, PSI's Answers to Global's Interrogatories at No. 5; Filing No. 69-14, 7-21-09 email chain; Filing No. 64-4, Shocket Dep. at 207). That contract lasted until 2012. (Filing No. 64-4, Shocket Dep. at 207).

During the third quarter of 2009, PSI informed Global that Indiana Live! had approached it "to provide some valet services" and asked whether Global was interested in submitting a joint proposal "as [PSI's] DBE [disadvantaged business enterprise] partner." (Filing No. 64-19, email chain re: Indiana Live! Casino). Rachael Hyatt of Global indicated that Global was interested, and requested copies of "the Contracts, Proforma, and Revenue Projection" for review. (Filing No. 64-20, 7-24-09 email chain re: Indiana Live! Casino). PSI provided Global with a draft of a joint proposal to provide valet parking services to Indiana Live! on August 6, 2009. (Filing No. 64-21, 8-6-09 Shocket email enclosing proposal).

On August 19, 2009, Shocket informed Darring and Hyatt that Indiana Live! had not yet made a decision concerning PSI and Global's valet parking proposal, and asked for the specific "benefits the state can give the casino thru the DBE participation." (Filing No. 64-25, 8-19-09 email chain re: Indiana Live!). Global provided the

6

information with the expectation that the information would be shared with Indiana Live! (Filing No. 64-26, 8-20-09 fax to Shocket re: MBE participation). PSI ultimately obtained the contract for valet parking services. (Filing No. 64-4, Shocket Dep. at 248-49). For reasons unknown, Global was not a party to the contract. (*Id.*).

### F. PSI's Other Proposals

PSI sent proposals to three other entities during the term of the JVA – the Indianapolis-Marion County Public Library, the Fort Wayne International Airport, and Hoosier Park Casino. Global did not learn of the existence of any of these proposals until after the present lawsuit was filed. (Darring Aff. ¶ 22).

The proposal to the Indianapolis-Marion County Library, sent on February 13, 2007, was for parking garage and surface lot facilities management. (PSI's Answers to Global's Interrogatories at No. 10; Filing No. 65-8, 2-13-07 Letter from PSI to Library Contract Administrator). The proposal to the Fort Wayne International Airport, sent in June 2008, was for parking management services. (PSI's Answers to Global's Interrogatories at No. 8; Filing No. 64-18, Shocket 30(b)(6) Dep. at 74-75; Filing No. 65-9, Appendix B to PSI's Proposal to the Ft. Wayne Airport). PSI did not obtain a contract with either the Indianapolis-Marion County Library or the Fort Wayne International Airport as a result of its proposals.

The proposal sent to Hoosier Park Casino, dated February 6, 2008, included a quote to provide valet parking and shuttle transport for Hoosier Park. (Filing No. 65-13, 2-6-08 Proposal to Hoosier Park Casino; Filing No. 64-18, Shocket 30(b)(6) Dep. at 48-50). The second proposal, sent on May 28, 2009, at the request of Hoosier Park, was for

the management and operation of valet parking at the casino. (Filing No. 65-14, 5-22-09 email chain re: Hoosier Park); Shocket 30(b)(6) Dep. at 52-54). Following a meeting with representatives of Hoosier Park, Shocket recommended that PSI change its May 28 proposal to list that PSI would partner with Global. (Filing No. 65-17, 6-4-09 email chain re: Updated Hoosier Park). The record contains two versions of an updated proposal to Hoosier Park, both dated June 8, 2009. In the first, PSI stated that it was submitting "this proposal together with Certified Disadvantaged Business Partner, [Global]." (Filing No. 65-18, 6-8-09 proposal to Hoosier Park). In the second, PSI noted that it held "relationships with Disadvantaged Business Enterprises in Indiana." (Filing No. 65-19, 6-8-09 proposal to Hoosier Park). PSI is unable to state which version of the June 8, 2009 proposal was ultimately provided to Hoosier Park Casino, but the record reflects that the casino received at least one of them. (PSI's Answers to Global's Interrogatories at No. 6; Filing No. 64-18, Shocket 30(b)(6) Dep. at 62). Ultimately, PSI did not obtain a contract with Hoosier Park for valet parking services.

## G. PSI's Discussions with the IAA in June 2009

In the Spring of 2009, Shocket contacted Darring and asked whether Global wished to partner with PSI to make a proposal to the IAA concerning the outsourcing of its garage and shuttle parking operations. (Darring Aff. ¶ 24). Darring informed Shocket that Global was not interested in pursuing this opportunity jointly with PSI, and reminded Shocket that PSI was explicitly prohibited from soliciting the IAA for parking garage and/or shuttle parking business by the non-competition and non-solicitation clause of the IAA JVA. (*Id*.).

In mid-June 2009, corporate executives from PSI, including Shocket, traveled to Indianapolis and met with IAA executives. (Filing No. 73-3, Shocket Dep. at 264). The parties dispute the original purpose of the meeting. Shocket testified that executives from the IAA reached out to PSI to find out whether other airports were outsourcing some or all of their garage and shuttle operations, because PSI had experience in that regard due to its presence at the Columbus airport. (*Id*.). According to Shocket, PSI did not know that, prior to the meeting, the IAA would discuss the possibility of PSI taking over the IAA's garage and shuttle operations. (*Id*. at 267). Global believes that PSI met with the IAA with full knowledge that a new business opportunity would be discussed, and purposefully excluded Global from the meeting. (Filing No. 64-4, Shocket Dep. at 271-74; Filing No. 65-20, 6-30-09 email chain re: IAA garage and shuttle operations).

On June 11, 2009, Shocket notified Darring of the meeting discussed above, and of the possibility of expanding their parking operations with the IAA. (Filing No. 66-2, 6-11-09 email chain; *see also* Filing No. 66-1, 6-20-09 memo from PSI to Darring). After he learned of the meeting, Darring became upset and, at some point thereafter, asked PSI not to pursue the opportunity. (Filing No. 73-3, Shocket Dep. at 268; 6-11-09 email chain; Darring Aff. ¶ 25). PSI honored that request. (*Id*.).

### H.      Global's Termination of the IAA Joint Venture Agreement

On October 9, 2012, Global terminated the IAA JVA pursuant to ¶¶ 13(a) and (d). Paragraph 13(a) provides that "PSI and Global may each terminate this Agreement, without cause, by not less than ninety (90) days' prior notice in writing to the other party." Paragraph 13(d) provides that either party may terminate the Agreement

immediately upon the occurrence of certain events, including "[t]he repetition of a breach by the other Party of any of its undertakings, obligations or covenants . . . ."

Following Global's termination of the IAA JVA, the IAA provided notice that it planned to terminate the contract it had with the IAA JV. (Filing No. 66-6, 12-17-12 email chain re: PSI). After some back and forth, Global and PSI agreed to continue the IAA JVA with the IAA on a month-to-month basis pending the IAA's ability to enter into a new contract for valet parking. (Filing No. 66-8, PSI email chain re: IND curbside valet).

## I.     Global and PSI Bid on the Premium Parking Services Contract

On February 19, 2013, the IAA issued an RFP for the management of its Premium Parking Valet Parking services. (Filing No. 66-9, 4-16-13 Board Memo). PSI, Global, and four other parking companies submitted responses to this RFP. (Filing No. 66-10, Global's 2013 RFP Response; Filing No. 66-11, PSI's 2013 RFP Response; Filing No. 66-9, Board Memo; Filing No. 66-12, March 2013 RFP Scoring Overview). Global began working on its proposal for the contract in November 2012 with the assistance of two former PSI employees, Jeni Robertson and Charlie McDaniel, and an outside consultant. (Darring Dep. at 104-05; Filing No. 69-9 (11-29-12 Email between Darring and consultant); Filing No. 69-10 (2-21-13 Email between Darring and Global's consultant re: proposal).

Following a round of interviews with the IAA's Staff Review Committee, Global and PSI were each selected as finalists. (Board Memo). Second interviews were conducted and, following those interviews, Global received the IAA Staff Review

Committee's recommendation.  (2013 RFP Scoring Interview).  PSI received the lowest overall score of the four finalists.  (*Id*.).  Global thereafter entered into an agreement with the IAA to provide premium parking valet services.  (Filing No. 66-14, Premium Parking Services Contract).  The term of the contract is from May 26, 2013, through May 25, 2016, with an option to renew for two (2) years.  (*Id*.).

All other facts necessary to a determination of this motion will be addressed in the Discussion Section.

## II.    Summary Judgment Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  In deciding whether a genuine issue of material fact exists on cross motions for summary judgment, the court's review of the evidence requires it to "construe all inferences in favor of the party against whom the motion under consideration is made." *Williams v. Aetna Life Ins. Co*., 509 F.3d 317, 321 (7th Cir. 2007) (internal quotation marks and citations omitted).

## III.   Discussion

The present dispute requires the court to interpret the parties' Letter Agreement and the IAA JVA.  In diversity cases such as this, the court applies federal procedural law

and state substantive law. *See Erie v. R.R. Tompkins*, 304 U.S. 64, 78 (1938). The rules of contract interpretation are substantive; therefore, Indiana contract law governs the parties' dispute. *Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 380 (7th Cir. 2001).

Under Indiana law, the primary objective in construing a contract is to give effect to the intent of the parties as expressed on the four corners of the document. *Cherokee Air Products, Inc. v. Buchan*, 14 N.E.3d 831, 834 (Ind. Ct. App. 2014) (citing *Kaghann's Korner, Inc. v. Brown & Sons Fuel Co.*, 706 N.E.2d 556, 565 (Ind. Ct. App. 1999)). Unambiguous terms are conclusive of the parties' intent; the court merely applies the language of the contract to the facts of the case. *Id.* The contract must be read as a whole and the language construed so as not to render any words, phrases, or terms ineffective or meaningless. *Id.*

If the district court determines the meaning of a contract is unambiguous, it may determine its meaning as a matter of law. *Simon Property Group, L.P. v. Michigan Sporting Goods Distrib., Inc.*, 837 N.E.2d 1058, 1070 (Ind. Ct. App. 2005). "'A contract term is not ambiguous merely because the parties disagree about the term's meaning.'" *Id.* (quoting *Roy A. Miller & Sons, Inc. v. Indus. Hardwoods Corp.*, 775 N.E.2d 1168, 1173 (Ind. Ct. App. 2002)). Rather, language is ambiguous only if reasonable people could come to different conclusions about the contract's meaning. *Id.* The construction of an ambiguous contract must be resolved by the trier of fact, rendering summary judgment inappropriate. *Walker v. Trailer Transit, Inc.*, 1 F.Supp.3d 879, 882 (S.D. Ind. 2014) (applying Indiana law).

### A. Count I, Breach of the Letter Agreement

Global alleges PSI breached the Letter Agreement by failing to provide it a right of first refusal to participate in "parking and parking related" contracts involving (1) PSI's Indiana Live! shuttle contract; and (2) PSIs alleged solicitations of the Hoosier Park Casino, the Indianapolis-Marion County Public Library, and the Fort Wayne International Airport.

### 1. Indiana Live! Casino Shuttle Contract

The parties' cross move for summary judgment with respect to Count I of Global's Complaint alleging that PSI breached the Letter Agreement by failing to provide Global with a right of first refusal to participate in the Indiana Live! shuttle contract. Global contends that PSI breached the Letter Agreement when it "solicited" and entered into a contract to provide shuttle parking services to Indiana Live! Casino in 2008 without providing Global a right of first refusal. PSI responds that the right of first refusal under the Letter Agreement only applied to valet parking opportunities and not to shuttle opportunities. This issue requires the court to interpret the term "parking and parking related services" in the Letter Agreement.

PSI contends that the Letter Agreement limits the parties' right of first refusal to valet parking opportunities for numerous reasons. First, PSI argues that the parties simultaneously executed the Letter Agreement and the IAA JVA, but made the IAA JVA effective prior to the Letter Agreement. Second, it argues that because there was only one Joint Venture Agreement entered during the term of the Letter Agreement, the definition of "parking and parking related services" used in that agreement (the IAA

JVA) applies to the Letter Agreement.  Third, it argues that Global's interpretation of the term "parking and parking related services" renders the Letter Agreement unenforceable.  Finally, PSI argues that Global understood the Letter Agreement to only apply to valet parking, as evidenced by its pursuit of other business opportunities.  Global argues just the opposite.

### a.      PSI's Arguments

PSI's first argument relating to the effective date of the IAA JVA is not supported by the terms of either the Letter Agreement or the IAA JVA.  Following the execution of the Letter Agreement on December 22, 2006, Global entered into the IAA JVA, which was made effective as of December 1, 2006.  Pursuant to the Letter Agreement, however, all joint venture agreements were deemed and acknowledged to have been entered into *after* the Letter Agreement.  (Letter Agreement at 3 ("As of the date of execution of this Agreement, there are no currently no [sic] executed Joint Venture Agreements between the Parties."); *see also id.* ("The Parties hereto will execute a specific Joint Venture Agreement for each specific parking client (hereinafter "Parking Contract Client)).  The Letter Agreement specifically provides that its terms shall be incorporated into "any and all Joint Venture Agreements by and between PSI and Global for the provision of parking and/or parking related services within the State of Indiana."  (*Id.* at 2).

The court also rejects PSI's claim that the definition of "parking and parking related services" in the IAA JVA applies to the Letter Agreement.  A fair reading of the Letter Agreement quickly reveals that its terms are incorporated into the IAA JVA, not the other way around.  Indeed, the Letter Agreement specifically provides that "the term

'parking and parking related services' shall have the meaning set forth in any applicable Joint Venture Agreement." (Letter Agreement at 1). The IAA JV, in turn, defines "parking and parking relates services" to mean "valet parking services and all other services . . . related to valet parking." (IAA JVA at 1). The fact that there was only one Joint Venture Agreement entered into by the parties is legally irrelevant. The parties' expectation, as evidenced by the plain language of the Letter Agreement, was to enter into multiple joint venture agreements in the future, as new opportunities arose. *See Capitol Constr. Servs. v. Gray*, 959 N.E.2d 294, 298 (Ind. Ct. App. 2011) ("'Interpretation of a written contract is achieved by ascertaining the intent of the parties at the time the contract was executed as disclosed by the language used to express their rights and duties.'" (quoting *Stumpf v. Hagerman Const. Corp.*, 863 N.E.2d 871, 876 (Ind. Ct. App. 2007))).

This interpretation of the Letter Agreement as requiring the parties to define the term "parking and parking related services" in future JVA agreements does not render it an unenforceable "agreement to agree." The typical agreement to agree occurs where the parties agree to be bound by a future document and contemplate future negotiations. *Block v. Magura*, 949 N.E.2d 1261, 1266 (Ind. Ct. App. 2011) ("It is well settled that 'a mere agreement to agree at some future time is not enforceable.'" (quoting *Wolvos v. Meyer*, 668 N.E.2d 671, 674 (Ind. 1996))). The Letter Agreement does refer to future joint venture agreements; however, the parties' expressed an intent to be bound[4] by, *inter*

---

[4] The parties also agreed to be bound by: (1) the method of compensation for general and administrative costs of facilitating each parking contract; (2) the allocation of capital

*alia*, the right of first refusal (noting that a party "shall have a right of first refusal" if one party solicits or is solicited, to provide parking or parking related services).  With specific regard to the term "parking and parking related contract", when one party came upon an opportunity to provide "parking and parking related services" to, *inter alia*, "Airport and/or Casino or Casino related businesses, within the State of Indiana," the party was required to bring that opportunity to the other to decide whether to join in that venture or not.  The term had to be broad enough to encompass those future parking opportunities.

### b.    The Parties' Conduct

PSI cites opportunities that Global undertook without notifying PSI which, PSI argues, definitively establish that Global understood the Letter Agreement to include only valet services.  For example:

- Global attended the pre-bid meeting for the Fort Wayne International Airport parking lot opportunity in mid-2008;

- Global communicated with the City of Indianapolis in 2008 regarding an RFI for parking meter management; and

- Global partnered with Denison Parking to submit a proposal to the City of Indianapolis in August 2008 to manage parking lots.

None of these business opportunities shed much light on the meaning of the term "parking and parking related services."  With regard to the Fort Wayne opportunity,

---

contributions and the like; (3) the incorporation by reference by its terms into "any and all Joint Venture Agreements"; (4) the confidentiality provision; and (5) the parties' agreement to the terms of the Letter Agreement.

Global's office manager attended the mandatory pre-bid meeting; Global did not submit a proposal or otherwise seek a contract with the airport. (Darring 30(b)(6) Dep. at 228-231). With regard to the second opportunity with the City of Indianapolis which the parties' call the "parking meter project," Darring testified that he discussed the matter with Shocket on several occasions and Shocket did not have any concerns about Global's possible involvement. (*Id*. at 305-06). Finally, with regard to the proposal to manage parking lots for the City of Indianapolis, Darring testified that he had no knowledge of any such agreement. (*Id*. at 309-311). Darring surmises that Denison Parking may have submitted the proposal with Global named as its MBE partner without first contacting Darring because, "We've teamed up. We're doing business now. And . . . they may have said, "'I know [Darring] will be involved with this. Let's put him in there.'" (*Id*. at 308-11).

On the other hand, Global cites the parties' joint January 2007 Grand Victoria proposal as evidence that the term "parking and parking related services" encompasses all types of parking contracts, including those for *shuttle and valet* parking services. (Filing No. 64-10, 1-4-07 Letter from Global and PSI to Grand Victoria Casino & Resort). In the letter, the parties describe their partnership as "featuring joint operation of all day-to-day functions including management . . . of valet parking and shuttle services at selected accounts." (*Id*.). PSI responds that the Grand Victoria proposal was for shuttle *and valet* services. Thus, according to PSI, Global was included because the proposal included a valet component.

### c. Darring's Testimony

The ambiguity of the term "parking and parking related services" is best exemplified through the testimony of Global's CEO, Hal Darring.

> Q:    As you read this [the Letter Agreement] and signed this as the CEO of Global, did you understand shuttle services to be part of parking and parking related services under the Letter Agreement?
>
> A:    At the time it was a legal conclusion.  It was more for, I believe, valet.  And it could be parking because, management in garages, sometimes valet are in garages.

(Filing No. 73-2, Darring Dep. at 148).

> Q:    Okay.  How about parking meter management?  Is that – do you understand that to be parking and parking related services under the term of the Letter Agreement?
>
> A:    Under the term of the Letter Agreement, like I had said, it was primarily for me to  help generate valet services for Parking Solutions.

(*Id*. at 150).

> Q:    Why is the City of Indianapolis parking meter project not a parking and parking-related services opportunity that was covered by the letter agreement?
>
> ***
>
> Q:    -- in Global's position?
>
> A:    At this time, I don't  -- I can't answer that.

(Darring 30(b)(6) Dep. at 305-06).

> Q:    . . . .  Is parking and parking related services, as you understood it under the Letter Agreement, limited to valet parking services?
>
> A:    When this letter was put together, I don't recall what exactly it was limited to, but I know we were trying to do business together with valet.

(Filing No. 73-2, Darring Dep. at 152-53).

> Q:     . . . .  Tell me your understanding of what is included under the term "parking and parking related services" as used in the Letter Agreement . . . .
>
> A:     Parking related services for this Letter Agreement was for Global Parking and Parking Solutions to generate additional business outside the Airport and how we were to govern that business for valet parking, casino, state, and federal contracts.
>
>     This Letter Agreement was to protect Parking Solutions from valet, so if I were to go out and get valet contracts, I would bring those to them; and it was to protect Global Parking from them going out for shuttle services.
>
> Q:     Does it include casino contracts that are not valet parking?
>
> A:     If it's shuttle services, yes.

(*Id.* at 155-56).

### d.     Conclusion

Upon consideration of the designated evidence submitted by the parties, the court finds the term "parking and parking related services," as that term is used in the Letter Agreement, is susceptible of more than one reasonable interpretation.  One could reasonably conclude that the parties intended the Letter Agreement to be of limited scope, and include only valet and valet-related services.  One could reasonably conclude that the parties intended the Letter Agreement to be broader in scope, and include (at least) shuttle and valet parking services.   As such, its construction must be finally determined by a trier of fact.  Therefore, the parties' cross motions for summary judgment on Count I, as it relates to the Indiana Live! shuttle contract, are **DENIED**.

## 2. PSI's Proposals to Hoosier Park, the Fort Wayne International Airport, and the Indianapolis Marion County Library

Next, Global claims the proposals PSI sent to Hoosier Park Casino, the Fort Wayne International Airport, and the Indianapolis-Marion County Library constitute "solicitations" under the Letter Agreement; therefore, it was obligated under the Letter Agreement to give Global a right of first refusal. In response to PSI's argument that it suffered no damages as a result of any of those alleged breaches, Global clarifies that it is not seeking monetary damages for these alleged solicitations; instead, it seeks a declaration that those alleged breaches of the Letter Agreement preclude PSI from enforcing "any purported restrictions in the IAA JVA against Global." As an aside, Global also argues in a footnote that "these improper solicitations demonstrate that PSI has unclean hands which prevent it from obtaining any equitable relief." PSI's Surreply responds only to Global's "unclean hands" argument. The more significant issue, as the court understands it, is the propriety of Global's declaratory judgment claim.

The Indiana Declaratory Judgment Act provides trial courts with the "power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." Ind. Code § 34-14-1-1. The stated purpose of the Act "is to settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations." Ind. Code § 34-14-1-12. Thus, "[w]hen considering a motion for declaratory judgment, the test to be applied is whether the issuance of a declaratory judgment will effectively solve the problem, whether it will serve a useful purpose, and whether or not

20

another remedy is more effective or efficient." *Mid-Century Ins. Co. v. Estate of Morris ex rel. Morris*, 966 N.E.2d 681, 688 (Ind. Ct. App. 2012).

A question concerning the construction or validity of a contract falls within the scope of the Indiana Declaratory Judgment Act. Ind. Code § 34-14-1-2; *see also* Ind. Code § 34-14-1-3 ("A contract may be construed either before or after there has been a breach of the contract."). Thus, a plaintiff uncertain of his or her rights under a contract may seek declaratory relief. Similarly, a plaintiff uncertain about being in breach of a contract may seek a declaratory judgment to avoid accruing avoidable damages. *Mid-Century Ins.*, 966 N.E.2d at 688 ("'The primary purpose of a declaratory judgment is to permit a plaintiff to obtain a declaration of its rights and liabilities before proceeding with a course of conduct for which it might be held liable, not to declare nonliability for past conduct.'" (quoting 22A Am. Jur. 2d *Declaratory Judgments* § 129 (2012))). "'A declaratory judgment is not available where the judgment cannot guide and protect the petitioner with regard to some future acts.'" *Id.* (quoting 22A Am. Jur. 2d *Declaratory Judgments* § 129 (2012)).

Global's Complaint alleges that "[d]ue to PSI's inequitable conduct and prior breaches of the IAA Joint Venture Agreement, PSI cannot enforce any purported restrictions in the IAA Joint Venture Agreement against Global Parking." (Compl. ¶ 39). In other words, Global alleges that PSI's prior material breaches preclude PSI from enforcing the non-competition and non-solicitation provision in the IAA JVA against Global with regard to Global's 2013 contract with the IAA. (*Id.* ¶ 40). Consequently, Global does not request the court to clarify the parties' rights under the Letter Agreement

and the IAA JVA to avoid accruing future damages; the alleged breaches of contract have already occurred. Instead, Global's claim is better characterized as a defense[5] to PSI's counterclaim for breach of contract based on Global's 2013 IAA contract. *See Henthorne v. Legacy Healthcare, Inc.*, 764 N.E.2d 751, 758 (Ind. Ct. App. 2002) ("'[A] party first guilty of a prior material breach of contract may not maintain an action against the other party or seek to enforce the contract against the other party should that party subsequently breach the contract.'" (quoting *Harvest Life Ins. Co. v. Getche*, 701 N.E.2d 871, 875 (Ind. Ct. App. 1998), *trans. denied*)). Accordingly, there is no basis for a declaratory judgment action.

To the extent these alleged breaches provide Global with ammunition against PSI's counterclaim requires Global to establish that: (1) PSI breached the Letter Agreement and (2) the breach was material. Whether there was a breach of the Letter Agreement requires the court to determine when a solicitation occurred, thereby triggering a party's right of first refusal. The right of first refusal in the Letter Agreement reads, in pertinent part:

> [I]f either party hereto solicits, or is solicited, to provide parking or parking related services during the term of this Agreement to any Indiana State, city or municipally owned, managed or operated business or facility, including but not limited to Airport and/or Casino or Casino related businesses within the State of Indiana (hereinafter State/Casino Contract"), the other party shall have a Right of First Refusal to participate in those contracts under a Joint Venture Agreement. The party soliciting, or being solicited, to provide said services under a State/Casino Contract must provide written notice to the other party within five (5) business days of receiving

---

[5] One of Global's listed defenses in its Answer to Parking Solution's Counterclaims provides, "PSI's claims are barred, in whole or in part, by the doctrine of first material breach." (Filing No. 20, Answer to Counterclaims at 6).

information of the potential State/Casino Contract business. The other
party shall then have fifteen (15) days to accept or reject the Right of First
Refusal in writing.

(Letter Agreement at 1).

According to Global, the right of first refusal is triggered upon the receipt of

information of the potential for a state/casino contract. According to PSI, there is nothing

within the right of first refusal clause that establishes exactly when either Global or PSI

had an obligation to bring a state/casino opportunity to the other. PSI understood the

Letter Agreement to require notice of a joint venture opportunity when a parking

customer actually selected PSI or Global to provide valet parking services. Only then,

argues PSI, was there enough information about the specific contract opportunity to allow

the parties to negotiate the necessary terms of a joint venture agreement around that

opportunity.

The right of first refusal is triggered upon the receipt of information regarding

potential state/casino business. The ambiguity surrounding the right of first refusal lies

with the adjective *potential*. One could reasonably conclude that "potential State/Casino

Contract" means the *first time* a party receives information regarding a State/Casino

opportunity. On the other hand, one could reasonably conclude that "potential

State/Casino Contract" means, as Shocket testified, when the proposal "turned into an

opportunity." (Shocket 30(b)(6) Dep. at 55). Therefore, the court finds a genuine issue

of material fact as to when the right of first refusal is triggered under the contract.

The next issue – whether the breach was material – requires the court to determine

whether the breach went to the heart of the contract. *Steve Silveus Ins., Inc. v. Goshert*,

873 N.E.2d 165, 175 (Ind. Ct. App. 2007). "Whether such a total breach exists is to be determined under the facts of the case, and whether the breach is material is itself a question of fact, to be decided by the trier of fact." *Ream v. Yankee Park Homeowner's Ass'n, Inc.* 915 N.E.2d 536, 543 (Ind. Ct. App. 2009) (citation omitted). The parties dispute whether the breach – if a breach occurred at all – is material. Global's concession that it suffered no monetary damages is germane to whether the breach is material, as is extrinsic evidence regarding the parties' intent, understanding, and expectations with regard to the Letter Agreement. Accordingly, the court finds a genuine issue of material fact exists as to whether the breach was material. Global's motion for summary judgment and PSI's cross motion for summary judgment on this issue are **DENIED**.

## B.      Count II, Breach of the IAA JVA

Global argues that PSI's material breaches of the Letter Agreement also constitute breaches of the IAA JVA. The Letter Agreement provides that it "shall incorporate by reference and be made a part of any and all Joint Venture Agreements by and between PSI and Global for the provision of parking and/or parking related services within the State of Indiana." (Letter Agreement at 2). In turn, the IAA JVA provides that "the terms of the [IAA JVA] are subject to the terms of th[e] Letter Agreement, and in the case of any inconsistencies as between the Letter Agreement and the [IAA JVA], the terms of the Letter Agreement shall govern." (IAA JVA at 1). The breaches at issue concern the right of first refusal in the Letter Agreement. It would not make sense for that provision to be incorporated by reference into the parties' joint venture agreement.

The right of first refusal must necessarily come *before* the parties' agree to become bound by a joint venture agreement; otherwise, there would be no joint venture agreement. Global's motion for summary judgment based on that issue is therefore **DENIED**.

Global next argues that PSI breached the non-competition and non-solicitation clause of the IAA JVA when PSI traveled to Indianapolis to meet with a representative of the IAA in June 2009 regarding its shuttle operations. (*See* IAA JVA ¶ 21 (providing that PSI may not solicit business with the IAA during the term of the agreement and for two years following the agreement's termination)). Global admits it suffered no damages, but argues that "this inequitable conduct is part of the larger pattern discussed above, and it further confirms both that PSI had unclean hands and that it was the first party to materially breach the IAA JV[A]." Global's independent claim for breach of contract is problematic because damages is an essential element of a breach of contract claim. *Corry v. Jahn*, 972 N.E.2d 907, 913 (Ind. Ct. App. 2012). PSI's meeting and discussion with IAA representatives regarding the provision of shuttle services for the Indianapolis airport is, however, relevant to its defense of prior material breach. Consequently, Global's motion for summary judgment for breach of the IAA JVA based upon this meeting is **DENIED**.

### C.     PSI's Affirmative Defenses

PSI advances three affirmative defenses to defeat Global's breach of contract claims regarding (1) the Indiana Live! Casino shuttle contract in June 2008, and (2) PSI's meeting with IAA to discuss shuttle operations in June 2009. They are: cure, waiver, and equitable estoppel.

### 1. Cure

PSI argues that, assuming PSI breached the IAA JVA by meeting with IAA representatives in June 2009 to discuss shuttle opportunities at the Indianapolis airport, it cured that breach. Global did not respond to this argument.

The IAA JVA contained a provision allowing any party to cure its breach once given notice of it in writing within thirty days. (IAA JVA ¶ 13(b)). In an email dated June 20, 2009, PSI notified Global of the IAA's inquiries regarding shuttle operations and notified the IAA that PSI could only provide shuttle services jointly with Global. (Filing No. 66-1, 6-20-09 Email from PSI). In a letter dated June 26, 2009, Global objected to PSI's communications with the IAA and asserted that they constituted a breach of the IAA JVA. (Filing No. 74-6, 6-26-09 Letter from Global). PSI ceased all discussions with the IAA regarding shuttle opportunities. It is not clear from the record whether PSI gave up the opportunity within thirty (30) days of Global's objection, or not. (*See* Filing No. 73-3, Shocket Dep. at 268 ("A: At some point Mr. Darring asked that we stop having conversations with the IAA. Q: Did you honor that request? A: We did."). Accordingly, the court finds a genuine issue of material fact as to whether PSI is entitled to the affirmative defense of cure.

### 2. Waiver

PSI next argues that Global has waived any claim that PSI's 2008 shuttle discussions with the IAA violated the IAA JVA, and has waived any claim that PSI's 2008 Indiana Live! shuttle contract violated the Letter Agreement. Waiver is "an

intentional abandonment or relinquishment of a known right, requiring both knowledge of the existence of the right and intention to relinquish it." *Pohle v. Cheatham*, 724 N.E.2d 655, 659 (Ind. Ct. App. 2000) (citation omitted). Waiver may be shown by either express or implied consent; thus, waiver may be shown by the acts, commissions, or conduct of the parties. *Koors v. Steffen*, 916 N.E.2d 212, 217 (Ind. Ct. App. 2009). Waiver is an affirmative act, and mere silence, acquiescence or inactivity does not constitute waiver unless there was a duty to speak or act. *Pohle*, 724 N.E.2d at 659. Whether a party waived a breach of contract is a question of fact. *Koors*, 916 N.E.2d at 217.

The Indiana Live! contract was for a two year period, beginning in June 2008 and ending in June 2010. Global took the position that PSI had breached the IAA JVA because it was required to give Global a right of first refusal to participate in the shuttle contract. (Filing No. 74-8, 7-24-09 Letter from Global). PSI responded that the Letter Agreement applied only to valet contracts. (Filing No. 74-9, 8-3-09 Letter from PSI; Filing No. 74-10, 12-3-09 Letter from PSI). Shocket testified that, as of March 2010, he believed the issue had been resolved. (Shocket Aff. ¶¶ 7, 8). Global did not voice another objection to PSI's 2008 Indiana Live! contract until October 2012 – some two and-a-half years later – when Global gave notice of termination of the IAA JVA. (*Id.* ¶¶ 7-10). Global maintains it remained silent because the Letter Agreement expired in December 2009 and thus, "there was nothing left to perform." Yet Global continued to perform under the IAA JVA with PSI. This evidence leads the court to find a genuine

issue of material fact as to whether Global waived PSI's alleged breach of the Letter Agreement.

The 2009 meeting with IAA officials implicates the IAA JVA. That agreement provides in part that the "[f]ailure on the part of a Party to complain of any act or to declare any party in default hereunder, irrespective of how long that failure continues, does not constitute a waiver by that Party of its rights with respect to that default." (IAA JVA ¶ 28). Accordingly, the terms of the IAA JVA preclude PSI from asserting waiver as an affirmative defense to this claim for breach of contract.

### 3. Equitable Estoppel

Lastly, PSI argues that Global is estopped from claiming that it is not bound by the non-compete and non-solicitation obligations of the IAA JVA due to PSI's execution of the 2008 shuttle contract with Indiana Live! and its 2009 discussions with representatives of the IAA. Estoppel is based on the underlying principle that "one who by deed or conduct has induced another to act in a particular manner will not be permitted to adopt an inconsistent position, attitude, or course of conduct that causes injury to such other." *Brown v. Branch*, 758 N.E.2d 48, 52 (Ind. 2001) (citing 31 C.J.S. Estoppel and Waiver § 2 (1996)). "The party claiming equitable estoppel must show its (1) lack of knowledge and of the means of knowledge as to the facts in question, (2) reliance upon the conduct of the party estopped, and (3) action based thereon of such a character as to change his position prejudicially." *Money Store Inv. Corp. v. Summers*, 849 N.E.2d 544, 547 (Ind. 2006) (internal quotation marks and citations omitted). Whether equitable estoppel precludes enforcement of the Letter Agreement is an issue of fact. *Ebersol v. Mishler*,

775 N.E.2d 373, 381 (Ind. Ct. App. 2002) (finding genuine issue of material fact existed on whether plaintiffs' complaint was barred by estoppel).

PSI argues it reasonably believed that the parties' dispute over the 2008 Indiana Live! shuttle contract had been resolved because Global continued to perform under the Letter Agreement and the IAA JVA. Shocket testified that PSI forwent opportunities to bid on the IAA shuttle RFPs because it understood, from Global's words and conduct, that the non-compete provision in the IAA JVA was being treated by the parties as fully binding. (Shocket Aff. ¶¶ 5-6, 10).

Global responds with three arguments. First, Global argues the "no waiver" provision contained in paragraph 28 of the IAA JVA should have alerted PSI that it could not rely on Global's silence as an assurance that it would not later assert a claim for breach of the IAA JVA. Second, Global argues that it never manifested an intent to waive a breach of contract claim in the Letter Agreement; therefore, there is no basis upon which PSI may claim that it acted in reliance on a non-existent waiver. Global's first two arguments may be asserted at trial, but to make a definitive finding that PSI should have known it could not rely on Global's silence, and that PSI should have known that Global did not affirmatively waive a claim for breach of the Letter Agreement, is to usurp the function of the trier of fact.

Lastly, Global argues that PSI cannot show it changed its position prejudicially due to Global's continued silence. Specifically, according to Global, PSI cannot show it passed up certain opportunities because it was prohibited from seeking opportunities with the IAA for two years following termination of the IAA JVA. Shocket testified to the

contrary. Accordingly, there exists a genuine issue of material fact as to whether Global is equitably estopped from relying on the doctrine of prior material breach.

### D. PSI's Counterclaims

The parties' cross move for summary judgment with respect to PSI's counterclaim that Global violated the IAA JVA by (1) soliciting PSI's employees and (2) bidding for and entering into a valet contract with the IAA.

#### 1. Former Employees

The employees at issue are Robertson and McDaniel, both former key employees of PSI when Global hired them. The parties' dispute is governed by paragraph 20 of the IAA JVA, which prohibited Global from hiring "any employee(s) of PSI . . . who provided parking and parking related services to any Parking Contract Client in the State of Indiana . . . ." (IAA JVA ¶ 20 at 7). This provision extended two years after the agreement expired. (*Id.*).

Global argues paragraph 20 of the IAA JVA prohibits it from hiring current employees of PSI; therefore, because Robertson and McDaniel were both *former* employees of PSI at the time they were hired by Global, Global did not violate the "no hire" provision. Not surprisingly, PSI argues just the opposite, citing the fact that paragraph 20 does not use the term "current" to modify the term "employee," and speaks in the past tense by use of the verb "provided." The court finds reasonable jurors could interpret this provision consistent with either Global or PSI.

Next, Global argues that PSI either explicitly or implicitly waived any claim as to Global's hiring of Robertson and McDaniel. First, Global cites to a September 23, 2011

email between Shocket and Darring. (Filing No. 72-4, 9-23-11 Email between Shocket and Darring). The email from Shocket to Darring reads, in relevant part:

> After speaking to the curbside/express team we think it is in the best interests of the joint venture for [McDaniel] (former employee) to work at other Global Parking operations and not at the airport. I do hope you support this decision. In the meantime if you want Charlie to begin working at Global Parking operations that is fine with me.

(*Id*.). Global claims the email stands for PSI's agreement that Global could hire McDaniel to work at the IAA on Global's behalf. A reasonable juror could interpret Shocket's response as an objection to Global hiring McDaniel to work at the IAA, but, at the same time, giving Global permission to use McDaniel at other locations.

Second, Global cites to a May 2013 notice from PSI to its employees, informing them that Global had been awarded the valet operations at the IAA. (Filing No. 72-6, Notice). The notice, written by Shocket, informed all PSI employees that if they were interested in obtaining a position with Global at the IAA, to contact Global. A reasonable juror could conclude from this notice that Shocket notified his employees, who had lost their jobs at the IAA due to the contract being awarded solely to Global, of a new employment opportunity there.

In conclusion, the court finds the language used in the September 2011 and May 2013 emails, and the conflicting inferences that can be drawn therefrom, are better left for a trier of fact. Global's motion for summary judgment and PSI's motion for summary judgment with respect to this issue are **DENIED**.

### 2.    The Valet Contract

Global contends it did not breach the IAA JVA by seeking and obtaining the valet services contract with the IAA in 2013 for two reasons. Global first asserts that, to the extent it breached the contract, its breach should be excused because PSI committed the first material breach of contract. The court has discussed the use of that defense *supra*, and need not discuss it any further. Second, it contends that PSI cannot establish that Global's bid on the IAA's 2013 premium parking services RFP or subsequent entry into a contract to provide those services caused any damage to PSI. This is because, according to Global, it came in first out of the four finalists, and PSI came in fourth. Thus, even if Global had not submitted a bid, PSI would still not have been awarded the contract. Instead, one of the other two finalists would have been awarded the contract.

PSI responds that it was damaged in numerous ways. For example, in a February 5, 2013 email to an IAA board member, Darring asked why the IAA would want to do business with PSI given PSI's history of late payments. (Filing No. 69-12, Darring 30(b)(6) Dep. at 274-275; Filing No. 63-13, 2-5-13 Email from Darring to Kelly Flynn). In addition, Global engaged PSI former employees Robertson and McDaniel to help create Global's valet parking proposal. (Shocket Aff. ¶¶ 24-25). Shocket testified their input was vital, as they had knowledge on how to staff and run valet operations at the IAA. (*Id.* ¶ 25). According to Shocket, Global needed Robertson's and McDaniel's knowledge and experience managing the valet parking operation at the IAA in order to represent to the IAA that Global could immediately take over the valet operations without interruption. (*Id.*). The court finds the evidence and the reasonable inferences that can be drawn therefrom raise a genuine issue of material fact on whether PSI was damaged as a

result of Global's solicitation and ultimate contract with the IAA. Global's motion for summary judgment and PSI's motion for summary judgment on this issue are **DENIED**.

## IV.  Conclusion

Genuine issues of material fact remain with respect to: (1) Count I and Count II of Global's Complaint; (2) PSI's Counterclaim; and (3) Global's affirmative defense of waiver, and PSI's affirmative defense of cure, waiver, and equitable estoppel. Accordingly, Global's Motion for Summary Judgment (Filing No. 62) is **DENIED**, and PSI's Motion for Summary Judgment (Filing No. 67) is **DENIED**.

PSI did not move for summary judgment with respect to Count III of Global's Complaint for a declaratory judgment; Global did. Because Global's declaratory judgment claim against PSI is based on alleged breaches of the Letter Agreement that have already occurred, Global's claim for declaratory judgment asserted in Count III of its Complaint must be dismissed. Those alleged prior breaches, involving PSI's proposals to the Indianapolis-Marion County Public Library, the Fort Wayne International Airport, and Hoosier Park Casino, may be asserted as a defense to PSI's counterclaim that Global breached the IAA JVA by bidding on and acquiring the premier parking contract with the IAA in 2013. In addition, PSI's June 2009 meeting and discussion with IAA representatives regarding the provision of shuttle services for the Indianapolis airport may also be asserted in that (Global's) defense.

**SO ORDERED** this 16th day of March 2015.

RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.